UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JAMES GRIFFITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:18-cv-03416-JRS-DLP |
| | ) | |
| BRUCE D. IPPEL, | ) | |
| MARK A. CABRERA, | ) | |
| DEBRA K. ELLINGTON, | ) | |
| JESSICA KENEKHAM, | ) | |
| LISA BERGESON, | ) | |
| JESSICA WIGAL, | ) | |
| T. AULER, | ) | |
| LUCRETIA L. CHEEK, | ) | |
| JUDY K. SWAIN, | ) | |
| STACEY SCOTT, | ) | |
| | ) | |
| Defendants.[1] | ) | |

**Order Granting Defendants' Motion for Summary Judgment,
Denying Plaintiff's Motion for Summary Judgment,
and Directing Entry of Final Judgment**

James Griffith is an Indiana Department of Correction (IDOC) inmate. He brings this civil

rights action pursuant to 42 U.S.C. § 1983 and Indiana state law against ten medical defendants,

all employees at New Castle Correctional Facility (New Castle). Mr. Griffith alleges that these

medical providers were deliberately indifferent to his serious medical needs, committed medical

malpractice, were negligent, and intentionally inflicted emotional distress on him during their

---

[1] At the initial screening, the Court dismissed claims against defendants at Wabash Valley Correctional Facility—Dr. Byrd, Dr. Chavez, and Nurse Huff, because all claims against them were untimely under the statute of limitations. Dkt. 7. The Court reinstated these defendants on May 15, 2019, when it granted Mr. Griffith's motion to reconsider. Dkt. 32. The Court ultimately granted these defendants' motion for summary judgment on March 5, 2020. Dkt. 71.

On March 23, 2021, the Court granted the parties' stipulation of dismissal regarding Mr. Griffith's claims against GEO Group, Inc., and this matter was dismissed with prejudice as to all claims against GEO Group, Inc. Dkt. 129 at 1.

treatment of his shoulder injury and associated pain between 2017 and 2018. All parties seek summary judgment, and these motions are now fully briefed. Dkt. 131; dkt. 143.[2]

For the reasons explained below, Mr. Griffith's motion for summary judgment, dkt. [131], is **DENIED**, and defendants' cross motion for summary judgment, dkt. [143], is **GRANTED**.

## I. Preliminary Matters

There are several preliminary matters that the Court will address before turning to its discussion of the merits of Mr. Griffith's claims. The Court discusses each of these preliminary matters, in turn.

### A. Dismissal of Defendants Cheek, Auler, and Swain

First, Mr. Griffith named three defendants in his complaint—Lucretia Cheek, T. Auler, and Judy Swain—that are not among the defendants listed in his motion for summary judgment. *See* dkt. 131 (Plaintiff's motion names the remaining 7 defendants). Pursuant to the Court's screening order, Mr. Griffith pleaded claims against these defendants based on his allegations that they each delayed his referral to a doctor for his shoulder condition, causing him prolonged pain. Dkt. 7 at 4-5.

---

[2] Rather than timely filing his reply and cross-response as directed by the Court, Mr. Griffith filed a motion for sanctions on August 12, 2021. Dkt. 154. The Court noted when it denied Mr. Griffith's motion for sanctions, that his motion was made up of the kinds of arguments better raised in a reply and cross-response for the Court to consider on summary judgment. Dkt. 161 at 6.

Mr. Griffith has not made any filings in this action since August 2021, and he had ample time to formulate a reply and cross-response as directed by the Court when it declined to impose a stay of the summary judgment proceedings the first time Mr. Griffith requested such relief. *Id.* at 8. The Court permitted Mr. Griffith one final opportunity to supplement his motion for summary judgment, which the Court directed should include any evidence he wishes the Court to consider in favor of his dispositive motion or in favor of his response in opposition to the defendants' cross motion for summary judgment. *Id.* Mr. Griffith did not utilize this opportunity to file such supplement.

However, when Mr. Griffith was deposed on September 30, 2020, Mr. Griffith testified that he did not have evidence against these defendants, would dismiss them, and would not oppose the defendants' summary judgment motion as to these defendants. Dkt. 145-14 at 73-75 (Griffith's Deposition).[3]

The Court now summarily finds that these three (3) defendants' unopposed motion for summary judgement establishes that **defendants Cheek, Auler, and Swain are entitled to summary judgment** as a matter of law. *Marcure v. Lynn*, 992 F.3d 625, 631 (7th Cir. Mar. 25, 2021) ("Rule 56 imposes an affirmative obligation on a movant that we cannot ignore merely because a nonmovant provides no responsive arguments."). Also, Mr. Griffith has otherwise failed to prosecute any claims against these three (3) defendants, which further justifies their dismissal. *Link v. Wabash R. Co*., 370 U.S. 626, 633 (1962) (holding that "a District Court may dismiss a complaint for failure to prosecute even without affording notice of its intention to do so or providing an adversary hearing before acting.").

**B. Plaintiff's Evidence**

The defendants question the admissibility of Mr. Griffith's evidence. The defendants argue that the bulk of Mr. Griffiths' evidence is inadmissible or immaterial. Dkt. 158-1 at 32.

### 1. Evidence Based on Undisclosed and Destroyed Documents

First, the defendants argue that Mr. Griffith testified in his deposition that he threw away notes that he kept during this litigation after he was finished drafting motions, including his dispositive motion, and that Mr. Griffith relied on these documents to support his motion and his

---

[3] When asked specifically about defendants Cheek, Auler, and Swain, Mr. Griffith stated "Yeah. Those are the three. I will not be pursuing those." Dkt. 145-14 at 74 ("Q. So you are willing to dismiss your pending claims against these three individuals? A. Yeah.").

affidavit testimony. *Id.* They argue that Mr. Griffith should not be permitted to "offer testimony based on undisclosed and destroyed documents." *Id.* at 8. The defendants filed a motion for sanctions because of Mr. Griffith's admitted destruction of evidence, which the defendants contend may have been potentially relevant to this action. Dkt. 102; dkt. 121. The Court denied the motion for sanctions without prejudice because it could not say with confidence that Mr. Griffith's conduct substantially prejudiced the defendants, and a sanction of dismissing the action was inappropriate.[4] Dkt. 121 at 3.

Though the defendants' arguments are well taken, it is unclear to the Court—as it discussed in its original order regarding sanctions—how the defendants have been substantially prejudiced or somehow harmed. Nor is there a clear indication to the Court that Mr. Griffith intentionally engaged in spoliation in bad faith. Thus, **the Court will not strike Mr. Griffith's affidavit or submitted evidence and will consider that evidence in analyzing the merits of his claims.**

### 2. Evidence Outside the Relevant Time Period and Hearsay

Second, the defendants argue that Mr. Griffith's proffered evidence is in part immaterial because he discusses irrelevant timeframes outside of those outlined by the Court's screening order. Specifically, he seeks to introduce evidence from 2016-2017, which is before Wexford of Indiana, LLC (Wexford), began providing health care services at Indiana's prisons. He also seeks to introduce evidence discussing timeframes outside the scope of what was permitted in the Court's screening order as it pertains to medical treatment by certain defendants after Wexford began providing services.

---

[4] The Court acknowledged in its order denying sanctions that the defendants may be entitled to present Mr. Griffith's admitted destruction of documents to the jury at trial and may be entitled to a jury instruction on spoliation of evidence. Dkt. 121 at 3.

Further, defendants argue that Mr. Griffith's affidavit contains hearsay that should be stricken under Fed. R. Civ. P. 56(h), as it was "submitted in bad faith in light of his intentional destruction of personal notes only after having the opportunity to cull such notes to cherry pick useful information." Dkt. 158-1 at 33. Defendants argue that Mr. Griffith "has unsurprisingly come forth with information in his affidavit which is not in any way indicated in his medical records and which presumably was obtained from his own handwritten notes," and that due to his own testimony "concerning his memory deficit and his destruction of documents—Plaintiff cannot rely on information gleaned from documents that were never supplied to Defendants." *Id.* at 35.

While seeing no indication of bad faith, as contemplated by Rule 56(h), in the submission of his declaration itself, the Court acknowledges that Mr. Griffith's purported evidence references timeframes outside the scope of the Court's screening order as it pertains to certain current defendants, and additionally references other medical staff who are not named defendants or who were defendants already dismissed from this action. As it pertains to this information, to the extent that it is irrelevant and immaterial, the Court need not consider it in its analysis. **The Court will only consider admissible facts, not hearsay, in support of the relevant timeframes and against the defendants as outlined in its screening order on summary judgment**. Fed. R. Civ. P. 56(c)(4).

### 3. Admissibility of Contracts

Finally, the defendants argue that the contracts Mr. Griffith's submitted are irrelevant because Mr. Griffith has no pending claim against Wexford or Geo Group, Inc. Specially, the contract between Wexford and the State of Indiana does not indicate personal involvement of any defendant, does not speak to defendants' use of reasonable medical judgment, does not concern

Mr. Griffith's receipt of medical services, and does not outline standards of care or breach of conduct, or whether a defendant's conduct was extreme or outrageous. *Id.* at 35-37.

The Court agrees that the contracts are not evidence that the defendants' violated Mr. Griffith's constitutional rights. A violation of policy by itself is insufficient to establish a constitutional violation. "Section 1983 protects against 'constitutional violations, not violations of . . . departmental regulation and . . . practices[.]'" *Estate of Simpson v. Gorbett*, 863 F.3d 740, 746 (7th Cir. 2017) (quoting *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003)). The contract provisions referenced by Mr. Griffith are relevant only to the extent that they provide some information about expected practices, and they will be considered for this purpose only. These contracts and provisions do not set the bar for determining whether an inmate's Eighth Amendments rights have been violated.[5] As the Court will discuss in its analysis, the defendants were not deliberately indifferent to Mr. Griffith's medical needs, and thus, his arguments about upholding certain policies or provisions is without merit in any event.[6]

---

[5] Mr. Griffith references RFP 17-012, 2.4.1, Scope of Work/General for the premise that IDOC offenders "shall have access to health care services to meet their health care needs" and that such care consists of various forms including primary care, nursing services, sick call, and so on. Dkt. 132-2 at 10. The services provided are to meet or exceed constitutional and community standards and applicable state policies, procedures, and directives. *Id.*

He further references 2.4.11, Routine Care Services, that states that these services should be provided in a "timely manner" and that most healthcare requests forms require face-to-face meetings with professionals, and any requests noting clinical symptoms must be seen face-to-face within 24 hours. *Id.* at 17-18. And, that Wexford agrees to meet and comply with these components. *Id.*

And finally, he asserts that IDOC Policy and Procedure 2.04 Access to Health Care, establishes that access to health care services shall be free of major barriers including non-health care staff deciding requests for health care services, request forms being repeatedly returned for more information, prolonged waits for sick call appointments, testing, or medications, and failure to honor prescriptions in a timely manner. Dkt. 132-3.

[6] The Court notes that Mr. Griffith argues that certain defendants did not see him within 24-hours or face-to-face for his requests regarding his shoulder injury. These arguments fail, as the Court

## II. Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome-determinative. *Montgomery v. Am. Airlines Inc.*, 626 F.3d 382, 389 (7th Cir.

---

has determined in its merits analysis that the defendants provided sufficient and appropriate care, and were not indifferent to Mr. Griffith's needs. The Court reminds Mr. Griffith his use of the contracts and provisions to support his arguments neglects to acknowledge that unimpeded access "does not mean an offender has a right to receive whatever services might be demanded, or to dictate when and in what manner the services will be provided. Appropriately trained health care personnel may control access to care for appropriate health reasons." Dkt. 132-3 at 126-127.

2010). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trs. of Ind. Univ.,* 870 F.3d 562, 573-74 (7th Cir. 2017). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, Local Union 150, AFL-CIO*, 335 F.3d 643, 647 (7th Cir. 2003). Cross-motions for summary judgment are treated separately. *McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 504 n.4 (7th Cir. 2008). When cross-motions for summary judgment are filed, courts "look to the burden of proof that each party would bear on an issue of trial; [courts] then require that party to

go beyond the pleadings and affirmatively to establish a genuine issue of material fact." *Santaella v. Metrop. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997).

## II. Material Facts

The following statement of facts has been evaluated pursuant to the standard above. The facts are considered undisputed except where disputes of fact are noted.

Mr. Griffith is an IDOC inmate and at all times relevant to his claims in this action, he was housed at New Castle. Dkt. 145-14 at 14. Mr. Griffith attests that on June 2, 2016, when he was housed at Wabash Valley Correctional Facility (Wabash), he was beaten by officers and his shoulders were injured as a result. Dkt. 132-4, ¶¶ 3-4.[7] Mr. Griffith received an x-ray while he was still housed at Wabash. *See* dkt. 132-3 at 132 (June 2016 x-ray showing "no acute osseous abnormality or significant degenerative change."). He was diagnosed with damage to his rotator cuff and told that an MRI could not be done because he was in segregation. Dkt. 132-4, ¶ 9; dkt. 145-14 at 26. Mr. Griffith was then transferred to New Castle, where he had several encounters with defendants regarding medical treatment for his shoulders. Throughout Mr. Griffith's requests for treatment of his shoulders, he "wanted some kind of testing to figure out what was actually wrong so it could be fixed, and [he] wanted something for pain management." Dkt. 145-14 at 48.

### A. Mr. Griffith's Medical Interactions with Defendants

Mr. Griffith's medical treatment for his shoulders, as it pertains to the defendants in this action, spanned from approximately September 2017 to August 2018. For ease of recitation of the material facts, the Court will address Mr. Griffith's interactions with each defendant, in near

---

[7] Mr. Griffith filed a lawsuit in this Court regarding his Eighth Amendment excessive force claims related to this incident with officers at Wabash. *See Griffith v. Brannick et al.*, 1:17-cv-00194-TWP-MJD, dkt. 218. This Court held a jury trial on the remaining claims in that action on March 2, 2020. All claims in that action were resolved in favor of the defendants, and Mr. Griffith took nothing by his complaint. *Id.*

chronological order. As it pertains to any reference of "chronic care" appointments or the "chronic care clinic," Mr. Griffith had conditions requiring chronic care in 2017, specifically seizures. Such status means that a patient is seen in the chronic care clinic about every 90 days. Dkt. 145-1, ¶ 10 (Ellington's Affidavit).

### 1. Nurse Debra Ellington—September 2017

Mr. Griffith alleges that Nurse Ellington took an excessive amount of time to respond to his healthcare request in September 2017 and refused to refer him to the doctor. Dkt. 1, ¶¶ 29-33; dkt. 7. At all times relevant to Mr. Griffith's claims, Nurse Ellington was a Registered Nurse at New Castle. Dkt. 145-1, ¶ 1.

Mr. Griffith submitted a healthcare request form on September 4, 2017, seeking treatment for his shoulder injury and pain, and stated he believed an MRI was needed. Dkt. 145-2 (request form). Nurse Ellington noted on the form, "NSC," presumably meaning nurse sick call, on September 11, 2017, and the medical record reflects that she saw Mr. Griffith on September 19, 2017. *Id.* at 1-4. She attested that Mr. Griffith reported that x-rays were taken at Wabash that had not indicated damage with his shoulders, but that he reported weakness and tingling in his left arm and pain. *Id.*; dkt. 145-1, ¶ 9. Nurse Ellington reviewed Mr. Griffith's medical records which indicated that he was seen at several provider visits in June, July, and August 2017. Dkt. 145-1, ¶¶ 4-6 (June and August visits were with a non-defendant nurse practitioner, July visit was with Dr. Ippel). Nurse Ellington attested that Mr. Griffith was also seen on September 5, 2017, before she saw him. *Id.*, ¶ 9. She noted that Mr. Griffith "had been prescribed a number of different medications to address his various complaints." *Id.*

Nurse Ellington conducted a nursing assessment and noted that Mr. Griffith had "palpable distal pulses, intact sensation, and normal range of motion." *Id.*, ¶ 10. She did not note any "alarm

features, such as discoloration, warmth, or swelling" and advised Mr. Griffith to use alternate hot and cold compresses as needed to ease pain, as well as to take his prescribed medications. *Id.* Though, Mr. Griffith asked for an MRI, in her role as a nurse, she could not order one, and the medical record did not indicate such testing was necessary in previous assessments. *Id.* Nurse Ellington advised Mr. Griffith to discuss this issue with the provider at his upcoming chronic care appointment. *Id.* She noted that he was due for a chronic care appointment less than a month from her interaction with him—on October 5, 2017. *Id.* Mr. Griffith was seen by a non-defendant provider on October 17, 2017. *Id.*, ¶ 8.[8]

Nurse Ellington attested that because Mr. Griffith "was already supposed to be seen within 2 weeks of [her] assessment, combined with the fact that he had been prescribed multiple medications to address his reported pain" she did not believe it appropriate to schedule him for a second provider visit. *Id.*, ¶ 11. She "provided instructions which were within the scope of [her] practice to manage" Mr. Griffith's shoulder stiffness and told him to discuss the MRI at his chronic care appointment. *Id.* The medical record indicates that Mr. Griffith had prescriptions that included Dilantin, Excedrin Migraine, Lamotrigine, Prednisone, Topamax, and Tylenol 325 mg for pain, as needed. Dkt. 145-2 at 2-4.[9]

---

[8] In his affidavit, Mr. Griffith states that he was not able to see the provider on this date due to short staffing, and he claims that his submitted evidence contains the cancellation of the provider visit with Dr. Ippel at pgs. 401-402. But, the Court notes that Mr. Griffith's documents are missing these pages. Dkt. 132-3 (notes page 399, then skips to 403). Even taking this as true, Mr. Griffith's inability to see a provider on this date does not have an effect on claims against Nurse Ellington, as she arguably could not control events that happened after her assessment of Mr. Griffith. In his deposition, Mr. Griffith stated if the medical records showed he had a visit with a provider on October 17, 2017, he "probably did see him." Dkt. 145-14 at 45. Even further, though, the medical record indicates that Mr. Griffith had a chronic care visit with a non-defendant provider, Dr. Bowen, on December 21, 2017. Dkt. 145-4 at 1-6.

[9] Dilantin, Topamax, and Lamictal are anticonvulsants used to treat epilepsy and seizure activity. Dkt. 145-12, ¶ 10 (Cabrera's Affidavit); dkt. 158-3 (Ippel's Affidavit).

### 2. LPN Jessica Wigal—December 2017 to January 2018

This action proceeds against LPN Wigal based upon Mr. Griffith's allegations that she delayed processing an x-ray order and did not follow a doctor's order to refer him for a consultation in between December 2017 and January 2018. Dkt. 1, ¶¶ 42-44; dkt. 7. At all times relevant to Mr. Griffith's claims, Nurse Wigal was a Licensed Practical Nurse at New Castle. Dkt. 145-3, ¶ 1 (Wigal's Affidavit).

Mr. Griffith attests that he submitted a healthcare request form on December 1, 2017 for his shoulders. Dkt. 132-4, ¶ 23. He was seen on December 21, 2017, by non-defendant provider, Dr. Bowen, and Nurse Wigal was not present during this interaction. Dkt. 145-3, ¶ 3. "Typically, Medical Assistants accompany physicians during provider visits." *Id.* "If a provider believes an x-ray is medically indicated, the provider would instruct a Medical Assistant, Registered Nurse, or Licensed Practical Nurse to generate" an x-ray requisition document. *Id.*, ¶ 4. In her role as an LPN, Nurse Wigal does not have the ability to request diagnostic testing, but she can "enter the verbal order" communicated to her by Dr. Bowen after his assessment. *Id.*, ¶ 5.

No document was submitted after Dr. Bowen's assessment in December 2017. Rather, Nurse Wigal attested that Dr. Bowen advised her that he wanted to x-ray Mr. Griffith's left shoulder on January 15, 2018, the date she generated the x-ray requisition. *Id.*; dkt. 145-4 (January 15, 2018 x-ray requisition and chart update).[10] Nurse Wigal noted the medical record at this time of the request, "which Dr. Bowen indicated related to his previous December 21, 2017, visit." Dkt. 145-3, ¶ 4.

---

[10] Nurse Wigal entered a note in Mr. Griffith's medical record on January 15, 2018 stating the reason for the x-ray order: "x-ray order per visit 12/21/17 with Dr. Bowen suggests xray of shoulder d/t shoulder pain r/t injury at Wabash Facility." Dkt. 145-4 at 5.

Dr. Bowen's notes indicated that his examination of Mr. Griffith suggested a "possible rotator cuff tear suggest xrays and basic shoulder **possible consult** with orthopod." Dkt. 145-4 at 1-6 (emphasis added). Nurse Wigal's notes indicated that an x-ray was to be ordered, and she generated the x-ray requisition accordingly.

### 3. Dr. Bruce Ippel—January 2018

This action proceeds against Dr. Ippel based on Mr. Griffith's allegations that Dr. Ippel refused to see him in January 2018 and continued an ineffective pain management treatment despite being informed that the treatment was not working.[11] Dkt. 1, ¶¶ 61-65; dkt. 7. At all times relevant to Mr. Griffith's claims, Dr. Ippel was employed by Wexford as a physician at New Castle. Dkt. 158-3, ¶ 1 (Ippel's Amended Affidavit).[12]

Dr. Ippel attested that he reviewed Mr. Griffith's medical records which indicated that he was seen by a non-defendant provider, Dr. Dew, on November 28, 2017. *Id.*, ¶ 5. He was also seen for a chronic care visit by Dr. Bowen on December 21, 2017, and as a result of this visit, was issued a bottom bunk pass that remained valid until June 21, 2018. *Id.*, ¶ 6. Dr. Ippel was not Mr. Griffith's provider in January 2018 and does not hold supervisory authority over Dr. Bowen or any other physician at New Castle. *Id.*, ¶¶ 12-13. In fact, to the best of his recollection, Dr. Ippel did not see Mr. Griffith as a provider in 2018 until May 15 that year. *Id.*, ¶ 11. Dr. Ippel was the site

---

[11] The Court explicitly notes that Mr. Griffith was not permitted to proceed with claims prior to the time period set out in the screening order. *See* dkt. 7 at 4. Mr. Griffith was permitted to proceed on an Eighth Amendment claim against Dr. Ippel based upon his allegations from January 2018. Though Mr. Griffith's affidavit references dates that he was seen or should have been seen by Dr. Ippel outside of January 2018, any issues related to these time frames were not raised in his complaint and were not permitted to proceed by the Court. Mr. Griffith cannot raise any such issues now at summary judgment.

[12] On January 10, 2022, the Court permitted the defendants leave to file and replace Dr. Ippel's original affidavit. Dkt. 161. Specifically, the revised affidavit corrects any misstatements concerning Dr. Ippel's review of Mr. Griffith's x-ray results in January 2018 and addresses Dr. Ippel's involvement or interaction with such results. *Id.* at 7.

medical director but maintained his "own list of patients" that he assessed and treated. *Id.*, ¶ 13. Other physician providers—inclusive of those who treated Mr. Griffith during this timeframe—*in locum tenens* physicians "were tasked with rendering medical care which they felt was appropriate and clinically based on their medical judgment and discretion." *Id.*

Dr. Ippel testified that the results of Mr. Griffith's x-ray, ordered on January 15, 2018, were returned to New Castle on January 24, 2018—but Dr. Ippel is not sure if he signed off on reviewing them or if Dr. Bowen did, as there is an initial "B" on the report, which could reference "Bowen" or "Bruce Ippel." *Id.*, ¶ 7. Dr. Ippel had no personal recollection of reviewing the results in January, and the diagnostic results could be reviewed by a provider, nurse practitioner, or physician assistant, though sometimes, Dr. Ippel would receive the reports. *Id.* If he received such reports, Dr. Ippel "would review the studies for actionable items and, if there were no actionable items," these would be placed in the medical file. *Id.* Specifically for x-rays, "actionable items include any abnormal finding in the report—abnormal joint spaces, indication of a fracture, bony abnormality, etc." *Id.* If any of these actionable items existed, the patient would be scheduled for a provider visit, outside referral, or additional studies. *Id.* If no actionable items existed, "sometimes the patient would be scheduled for a visit to discuss the normal results of the lab or imaging study." *Id.*

Mr. Griffith's x-ray results showed no acute fracture or dislocation, joint spaces were intact, and no acute osseous abnormality or significant degenerative change was found. Dkt. 158-4 (radiology results from January 24, 2018). As such there were no actionable items. Dr. Ippel attested that in light of Dr. Bowen's physical assessment, x-ray results, and Mr. Griffith being on

pain medication,[13] it was Dr. Ippel's opinion that such course of treatment was reasonable and within the standard of care. Dtk. 158-3, ¶ 8.

In February 2018, Dr. Ippel was contacted and informed that Mr. Griffith was hoarding[14] numerous Dilantin and Topamax pills, both anticonvulsants that treat epilepsy and seizure. *Id.*, ¶ 9. Dr. Ippel ordered that these prescriptions be discontinued because hoarding medications risks a patient consuming a large dose to the point of causing irreversible damage to organs or death in potential overdose, and "it is appropriate to discontinue the medication to prevent" this type of abuse. *Id.*; dkt. 158-4 at 6-12. Mr. Griffith was seen by non-defendant provider Dr. Robertson ten days later and reported increased seizure activity due to Dilantin being discontinued, and Dr. Robertson prescribed Keppra 500 mg to address seizures and reordered Dilantin. Dkt. 158-3, ¶ 10; dkt. 158-4 at 7-12. Keppra is also used as a painkiller "by altering the brain's perception of pain." Dkt. 145-12, ¶ 9.

Dr. Ippel saw Mr. Griffith for a provider visit himself on May 15, 2018, related to Mr. Griffith's migraines, and Dr. Ippel prescribed Lamictal and ordered lab tests to monitor various metrics. Dkt. 158-4 at 10-12; dkt. 158-3, ¶ 11. Mr. Griffith attests that he told Dr. Ippel, he was still experiencing issues with his shoulder, but that Dr. Ippel told him he would need to submit a separate healthcare request to be seen for his shoulders. Dkt. 132-4, ¶ 37. Mr. Griffith says he submitted healthcare requests after this appointment, related to his shoulder, and was not seen until

---

[13] It is unclear to the Court what pain medication Dr. Ippel is referring to, but the medical record indicates that Mr. Griffith had active prescriptions for Dilantin, Excedrin Migraine, Lamotrigine, and Topamax through March or June 2018 when Dr. Bowen saw him on December 21, 2017. Dkt. 145-4 at 1-6. Regardless, Dr. Ippel was not Mr. Griffith's provider during this time, and the indications of the x-ray did not warrant a follow-up in any event.

[14] Mr. Griffith disputes that he was hoarding pills but the Court notes that his prescriptions were shortly reinstated at his next visit with a non-defendant provider on February 14, 2018.

June 2018 by Nurse Kenekham. *Id.*, ¶ 41. Dr. Ippel attested Mr. Griffith only complained about his migraines, and the medical record supports this contention. Dkt. 158-3, ¶ 11; dkt. 158-4 at 10-12 (patient reported history of migraines with disabling pain due to seizures, "seems healthy and well but no exam needed today").[15]

Dr. Ippel saw Mr. Griffith on August 27, 2018. Dkt. 145-12, ¶ 16. Mr. Griffith was in the infirmary for seizures, had refused his Dilantin during a recent hunger strike, and was being observed for his condition. *Id.* Dr. Ippel increased Mr. Griffith's dose of Keppra at this time to 1,000 mg twice[16] per day, instructed he should do his physical therapy, and that he should stretch his shoulders. *Id.* Dr. Ippel also ordered x-rays of Mr. Griffith's shoulders because he reported he had re-injured his shoulder in a recent seizure that month. *Id.* Dr. Ippel noted that there were not likely significant additional interventions that would be offered regarding his shoulder, and that physical therapy would be his best option at this time. Dkt. 145-13 at 12-13. At this time, Mr. Griffith had prescriptions for Mobic and the increased prescription of Keppra, active through November and December 2018. *Id.* at 13-14.

---

[15] Even if Mr. Griffith discussed his chronic shoulder issue with Dr. Ippel at this time, and the appointment was to only address migraines, by Mr. Griffith's own assertions, Dr. Ippel informed him that he needed to put in a separate healthcare request form. In his affidavit, Mr. Griffith goes on to state that he did so a couple of times in late May 2018, and one was rejected because he had already seen Dr. Ippel on May 15, 2018. Dkt. 132-4, ¶ 39-40. However, the Court finds that at the time he saw Dr. Ippel on May 15, 2018, he had an x-ray result that indicated no follow up was necessary because there were no actionable items to tend to, and he was actively receiving a prescription for Keppra 500 mg, through November 12, 2018, to address his seizures and pain. The response to his healthcare request on May 17, 2018, does not appear to be signed by any of the defendants in this action. Dkt. 132-3 at 172. Mr. Griffith was ultimately seen in response to his May 20, 2018 healthcare request form, on June 6, 2018. At that time, he was encouraged to try Aleve and warm compresses and was referred to a provider for an x-ray. *Id.* at 173. However, Mr. Griffith was allowed to proceed on claims against Dr. Ippel in January 2018, and service dates after that are arguably treatment that occurred outside of this time.

[16] The medical record indicates that Mr. Griffith requested Neurontin with Keppra, but this is contraindicated for a patient with a history of drug dependence or abuse. Dkt. 145-12, ¶ 17.

### 4. LPN Jessica Kenekham – March 2018 – April 2018

This action proceeds against LPN Kenekham based on Mr. Griffith's allegations that she took an excessive amount of time to respond to Mr. Griffith's health care request and then refused to refer him to a doctor in March 2018. Dkt. 1, ¶¶ 66-72; dkt. 7. At all times relevant to Mr. Griffith's claim, Nurse Kenekham was a Licensed Practical Nurse at New Castle. Dkt. 145-7, ¶ 1 (Kenekham's Affidavit).

On March 13, 2018, Mr. Griffith submitted a healthcare request form about his shoulders seeking a referral to a provider to have a follow-up appointment for the x-rays that were ordered by Dr. Bowen in January 2018. Dkt. 145-7, ¶ 4. Nurse Kenekham reviewed Mr. Griffith's medical records. She noted that he had been scheduled to be seen by a non-defendant nurse practitioner on March 17, 2018, but did not attend the appointment, and was rescheduled for April 16, 2018. *Id.*, ¶¶ 5-6.

Nurse Kenekham saw Mr. Griffith on April 17, 2018, assessed his shoulder, and provided a pack of 24 tablets of Tylenol for his reported shoulder stiffness. *Id.*, ¶ 7; dkt. 1 (Griffith acknowledges she gave him Tylenol in his complaint signed under penalty of perjury). She communicated to Mr. Griffith that he had been seen by previous providers, a follow-up had not been deemed necessary because his x-ray was normal, and it was her understanding that Dr. Ippel had made this determination.[17] Dkt. 145-7, ¶ 7. She further instructed Mr. Griffith to apply heat and ice. *Id.*, ¶ 8. Mr. Griffith was instructed to submit a new healthcare request if the pain continued. Dkt. 145-8 at 1-9.

### 5. Nurse Lisa Bergeson – May 2018

---

[17] As the Court previously discussed, Dr. Bowen could have made this determination, as the initials on the review of the x-ray indicated the letter "B," for possibly Dr. Bowen or Dr. Bruce Ippel.

Mr. Griffith alleges that Nurse Bergeson denied his healthcare request forms and declined to refer him to a doctor in May 2018. Dkt. 1, ¶¶ 35-41; dkt. 7. At all times relevant to his complaint, Nurse Bergeson was a Registered Nurse at New Castle. Dkt. 145-9 at ¶ 1 (Bergeson's Affidavit).

Mr. Griffith attested that on May 1, 2018, he submitted a request for healthcare form for his shoulders, again seeking an MRI and further treatment. Dkt. 132-4, ¶ 35. He also submitted a request, shortly before this one, on April 28, 2018, pertaining to his chronic migraines. *Id.* Nurse Bergeson attested that she has no independent recollection of the healthcare request form about the MRI, and a review of Mr. Griffith's paper chart does not show a request form. Dkt. 145-9, ¶ 3. Mr. Griffith attested that he received a response on May 11, 2018, that said "please see attached" that was stapled together with the response to his request about his migraines. Dkt. 132-4, ¶ 35.[18] Nurse Bergeson's response to Mr. Griffith's request about his migraines was dated May 6, 2018, and she indicated that the topic was addressed multiple times before. Dkt. 132-3 at 170.

It is not disputed that Mr. Griffith saw two nurses for his annual nurse well encounter on May 2, 2018, and that he saw Dr. Ippel on May 15, 2018, for his migraines. As a nurse, Ms. Bergeson cannot order an MRI. Dkt. 145-9, ¶ 6. At this time, Mr. Griffith continued to have a normal x-ray result and an active prescription for Keppra at his May 15, 2018, appointment, as well as active prescriptions to address his migraines. Dkt. 158-4 at 10-12.

---

[18] The Court notes Mr. Griffith has included a copy of this May 1, 2018 healthcare request that does seek an MRI and does relate to his shoulder. Dkt. 132-3 at 169. This document does state please see attached but does not include any signature or date from health care staff. Though, the handwriting seems similar to the handwriting on the form Nurse Bergeson signed and dated relating to his migraines, the Court does not find that his creates a material fact issue. The document does not clearly evidence that Nurse Bergeson denied Mr. Griffith's request related to his shoulders. If Nurse Bergeson simply overlooked or did not complete a response to this request form, this does not establish that she was deliberately indifferent to Mr. Griffith's request for an MRI or shoulder treatment. Moreover, Mr. Griffith's shoulder issue had been addressed multiple times before and he had received treatment, including pain medication.

### 6. Dr. Mark Cabrera – June 2018 to September 2018

Mr. Griffith alleges that Dr. Cabrera declined to authorize an MRI in August 2018 and did not change an ineffective pain management treatment that was not working even though x-rays did not reveal the source of the pain. Dkt. 1, ¶¶ 73-83; dkt. 7. At all times relevant to Mr. Griffith's complaint, Dr. Cabrera was a physician at New Castle. Dkt. 145-12, ¶ 1.

Prior to Dr. Cabrera's medical treatment, Mr. Griffith had been seen by non-provider defendant, Dr. Robertson, in June 2018, and he was prescribed Mobic to address pain and inflammation and was referred to physical therapy "to attempt to regain strength and flexibility." *Id.*, ¶ 5-6; dkt. 145-13 at 1-3. On August 13, 2018, custody staff confiscated Keppra, Lamictal, and Celexa pills from Mr. Griffith's cell, and a medical note was entered. Dkt. 145-12, ¶ 8; dkt. 145-13 at 4-5. Dr. Ippel was notified and discontinued Keppra and Lamictal. Dkt. 145-13 at 5. Mr. Griffith had also been on a hunger strike at this time. *Id.*

Dr. Cabrera's affidavit references several times when Mr. Griffith refused or otherwise did not attend physical therapy or would not allow nurses to assess him. Dkt. 145-12, ¶¶ 18-20.[19] Dr. Cabrera also noted Mr. Griffith's medical visit with Dr. Ippel in August 2018 and the reinstatement and ultimate increase of Keppra, and other directives for Mr. Griffith to participate in physical therapy and for additional x-rays due to a potential re-injury of the shoulders due to seizures. *Id.*, ¶ 16.

---

[19] The medical record indicates that Mr. Griffith refused physical therapy on August 21, 2018, and refused to be assessed by nurses on August 22, 2018. Dkt. 145-12, ¶ 12-13. He had been on hunger strike, was assessed by mental health, and was not taken to physical therapy on August 23, 2018. *Id.*, ¶ 14. He refused to participate in therapy on August 28, 2018. *Id.*, ¶ 18. He could not partake in physical therapy on August 30, 2018, due to custody not permitting him to be without trip gear. *Id.*, ¶ 19.

Dr. Cabrera treated Mr. Griffith on August 31, 2018, in a follow-up after he was discharged from the infirmary due to seizures. *Id.*, ¶ 20. Custody staff would not allow Mr. Griffith to be uncuffed for this exam, and Dr. Cabrera attempted to conduct a physical exam of his shoulders, though it was limited. *Id.* Because Dr. Ippel had doubled Mr. Griffith's dose of Keppra, Dr. Cabrera ordered labs to monitor those levels to see if anything should be changed about the treatment plan for pain or seizures. *Id.*

Dr. Cabrera also noted that Dr. Ippel ordered x-rays on August 27, 2018, but they had not been taken, and entered an order for them "to monitor for sign of arthritis or other degenerative change in Mr. Griffith's shoulders." *Id.* Dr. Cabrera determined Mr. Griffith had rotator cuff disorder, or inflammation from overuse of the shoulder; he attested this is diagnosed through physical exams and x-rays. *Id.*, ¶ 21. Dr. Cabrera attested that the "first-line of treatment for rotator cuff disorders is to rest the shoulder, and alternate ice and heat. Anti-inflammatories may also be used to reduce inflammation in the joint." *Id.*, ¶ 22. Physical therapy is also recommended and is "necessarily uncomfortable, as improving both strength and flexibility requires hard work and commitment to the treatment plan, which is why pain medication is typically prescribed[.]" *Id.*

Because Mr. Griffith was refused or was unable to attend physical therapy, Dr. Cabrera order it as continued treatment. *Id.* Dr. Cabrera did not believe an MRI was indicated, and even though Mr. Griffith believes that repeat x-rays are not effective treatment, "repeat [x-ray] results can indicate[] a change in the affected joint over time[,]" monitor for any fractures, show joint spacing and degenerative changes, and "provide valuable insight as to internal inflammation of the shoulder joint and surrounding tissue, and can also provide information concerning the anatomic alignment of the internal structures of the body." *Id.*, ¶ 23.

The medical record indicates that Mr. Griffith refused to supply a urine sample in early September 2018 – and then submitted a lab draw on September 13, 2018. *Id.*, ¶¶ 24-26; dkt. 145-13 at 23. His Keppra levels[20] were less than 2, "which is below the lower bound of the detectable range of 3." Dkt. 145-12, ¶¶ 24-26; dkt. 145-13 at 26-27. Given an increased dosage, Dr. Cabrera anticipated that the labs would show at least a detectable level, if not significantly higher, because the half-life is 6-8 hours—"meaning it would take approximately 2 days avoidance for the level to decrease to a non-detectable level." Dkt. 145-12, *Id.*, ¶¶ 26-27. "A finding of less than 2 in the lab results indicated that Mr. Griffith was not in fact taking Keppra," and Dr. Cabrera discontinued it accordingly. *Id.*

### 7. HSA Stacey Scott – August 2018

Mr. Griffith alleges that HSA Stacey Scott would not assist him with receiving a cuff-in-front pass, which prolonged his pain, and that she declined to refer him to a doctor. Dkt. 1, ¶¶ 50-60; dkt. 7. At all times relevant to his claims, Ms. Scott was the Health Services Administrator (HSA) at New Castle. Dkt. 145-10, ¶ 1. The role of the HSA includes predominantly administrative rather than clinical duties, such as responding to formal grievances directed to the medical staff. *Id.*

Mr. Griffith submitted three healthcare request forms, on August 5, 6, and 17, 2018, and though it was not typical for Ms. Scott to respond to such requests, the nursing staff forwarded Mr.

---

[20] Mr. Griffith testified that initially, he was given the lower dose "for at least a week" after Dr. Ippel changed the Keppra prescription to 2,000 mg per day, and he put in requests to have this addressed. Dkt. 145-14 at 106. To the extent that Mr. Griffith argues that this contributes to why his levels were lower, the Court does not find that it creates a material issue of fact. Rather, it further establishes that Mr. Griffith was not taking the correct dose, or not taking the medication at all, and the Court finds that either version supports the argument that Mr. Griffith cannot establish that the treatment was ineffective because he was not taking the doses appropriately or as intended per the provider's orders.

Griffith's requests for a cuff-in-front pass and access to physical therapy to her. *Id.*, ¶ 3. Ms. Scott responded to the first request after review of Mr. Griffith's medical records and assessments, that his x-ray result was normal and there was no clinical indication for a cuff-in-front order.[21] *Id.*, ¶ 4. To the second, she responded that Mr. Griffith was refusing all medical interventions due to hunger strike, and he would need to be assessed to see if he met such criteria, and there was no indication for the exception. *Id.*, ¶ 5. Finally, she responded that Mr. Griffith had refused physical therapy. *Id.*, ¶ 6. Ms. Scott reiterated these findings in her response to Mr. Griffith's formal grievance that month. *Id.*, ¶ 7. At the end of the month, Dr. Cabrera saw Mr. Griffith for a provider visit and ordered x-rays and lab tests to monitor his levels of Keppra. *Id.*, ¶ 8. On September 14, 2018, Ms. Scott noted in her response to Mr. Griffith's grievance that he had written medical asking for a letter to be cuffed in front, but that this had been denied. Dkt. 132-3 at 199.

Mr. Griffith testified that prior to August 2018, he had not discussed with any provider whether or not he qualified for a cuff-in-front pass because he was not in segregation, which is the only place you would need to be cuffed. Dkt. 145-14 at 85. At the very least, Mr. Griffith said he would have to be cuffed to travel from segregation to the infirmary. *Id.* at 86. Mr. Griffith was unaware if Ms. Scott ever spoke to the providers or anyone from the segregation unit about his request. *Id.* at 88-89. It is undisputed that Ms. Scott is not a provider and does not have authorization to provide a cuff-in-front pass. *Id.* at 90-91.

---

[21] Ms. Scott noted that Mobic had been prescribed for pain and the following: "X-Ray completed 1/24/18 with no abnormality or significant degenerative changes noted. No report of injury since older 2016 injury. No clinical indication for documentation requested." Dkt. 145-11 at 1-4. And later, that Mr. Griffith was "currently refusing all medical interventions and on hunger strike," and "would need to be assessed to identify [any] range of motion issues as nothing previously suggests issues meeting the criteria" for the cuff-in-front pass. *Id.* And in regard to physical therapy and Mr. Griffith's failure to attend: "You failed to show, so we obtained information from custody as to why. Either way, you were rescheduled by the physical therapist the same day of your no show. If you continue to have issues of no escort, talk to your UTM." *Id.*

### C. Mr. Griffith's Physical Therapy

The record includes physical therapy progress notes kept during the course of Mr. Griffith's treatment. Dkt. 132-3 at 183-187. It also includes the medical charts related to the physical therapist's treatment. The therapist saw Mr. Griffith on July 19, 2018. She noted that he was taking Mobic, which helped a little, and that he keeps his arms close to his sides. *Id.* The therapist instructed Mr. Griffith not to allow his arms to stay abducted in this manner even if there was some discomfort, and she was unsure that Mr. Griffith would benefit from physical therapy because he had adopted a sedentary lifestyle. *Id.* A latter session indicated that Mr. Griffith took time off from therapy due to pain, and he still moved in a guarded manner with limited range of motion. *Id.* The therapist notes include several missed sessions due to refusals or because Mr. Griffith was not allowed to attend. *Id.* The therapist's final notes on September 18, 2018, indicate that Mr. Griffith should keep in contact with his provider for further treatment options as an "MRI would be next diagnostic option most likely," and that no further physical therapy was to be conducted because no gains were being met. *Id.* The medical chart indicated that Mr. Griffith was not benefiting, after being seen for four sessions, and needed further diagnostics and a possible ortho consult per the therapist interactions. *Id.* at 212.

### D. Griffith's Medical Treatment After 2018

Dr. Cabrera reviewed a report by non-defendant Dr. Gary Misamore from February 19, 2020, which indicated that Dr. Misamore conducted a physical exam, x-rays, and MRIs for Mr. Griffith's shoulders. Dkt. 145-12, ¶ 28. The specialist found that there was a lack of crepitus in the shoulders and there were no osseous or soft tissue abnormalities in either shoulder, and the diagnosis was "mild rotator cuff tendinosis with no rotator cuff tear." *Id.* "Dr. Misamore appears

to have concluded that Mr. Griffith's subjective complaints do not match the objective findings of the diagnostic tests or physical exam." *Id.*

Mr. Griffith claims he was diagnosed with a "frozen shoulder," and Dr. Cabrera states that the typical treatment is physical therapy and anti-inflammatory medication. *Id.*, ¶ 29.

### III. Discussion

The defendants are entitled to summary judgment in their favor, as the Court finds that they were not deliberately indifferent to Mr. Griffith's shoulder injury. Part A of this discussion addresses the federal claims against each respective defendant. Because the Court finds that the defendants are entitled to judgment as a matter of law on the federal claims in this action, the Court addresses its exercise of supplemental jurisdiction over Mr. Griffith's state law claims of medical malpractice, negligence, and intentional infliction of emotional distress in Part B of its discussion.

#### A. Eighth Amendment Deliberate Indifference

At all times relevant to Mr. Griffith's claims, he was a convicted inmate. This means that the Eighth Amendment applies to his deliberate indifference claims. *Estate of Clark v. Walker*, 865 F.3d 544, 546, n.1 (7th Cir. 2017) ("the Eighth Amendment applies to convicted prisoners"). To prevail on an Eighth Amendment deliberate indifference claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed but disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019); *Petties v. Carter,* 836 F.3d 722, 728 (7th Cir. 2016); *Pittman ex rel. Hamilton v. Cty. of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014); *Arnett v. Webster,* 658 F.3d 742, 750-51 (7th Cir. 2011).

"A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014). The "subjective standard requires more than negligence and it approaches intentional wrongdoing." *Holloway v. Del. Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012).

Mr. Griffith does not have a constitutional right to demand specific medications or treatment. *Arnett,* 658 F.3d at 754 ("[A]n inmate is not entitled to demand specific care and is not entitled to the best care possible…." Rather, inmates are entitled to "reasonable measures to meet a substantial risk of serious harm."). "A medical professional is entitled to a deference in treatment decisions unless no minimally competent professional would have [recommended the same] under the circumstances." *Pyles*, 771 F.3d at 409. "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.* (internal citation omitted).

For purposes of their cross motion for summary judgment, the defendants do not dispute that Mr. Griffith's shoulder condition was an objectively serious medical need. Dkt. 158-1 at 52. Rather, they dispute whether the defendants were deliberately indifferent to that condition.

### 1. Nurse Ellington

Mr. Griffith wanted Nurse Ellington to refer him to a provider or to "provide something." Dkt. 145-14 at 46. But, it is undisputed that Nurse Ellington's role does not authorize her to order specific testing, such as an MRI. Though Mr. Griffith wanted to dispute his deposition testimony later in his motion for sanctions, about whether Nurse Ellington gave him Tylenol, this argument is unavailing. Mr. Griffith testified that he believed he was given a starter pack of Tylenol at this time and that he was receiving various other medications noted in the medical record. *Id.* Even assuming that Nurse Ellington did not give Mr. Griffith a starter pack of Tylenol herself as a result

of this visit, the medical record indicates it was among his prescriptions at the time she reviewed his medical record and examined him on September 19, 2017.

The record also indicates there were no outstanding orders for testing or indication that an MRI was necessary, and Mr. Griffith testified that he discussed his prior x-ray results with Nurse Ellington, specifically that there were no broken bones. Dkt. 145-14 at 49. Mr. Griffith has presented no evidence that Nurse Ellington unreasonably denied him access to an appropriate medical provider or was otherwise indifferent to his shoulder injury. Nurse Ellington reviewed his medical record and previous appointments, reviewed his current prescriptions, consulted him about using hot and cold compressions, and noted that he was due for his upcoming chronic care appointment with a provider and she instructed him to discuss his desire for an MRI with that provider. The defendants contend that Nurse Ellington is not liable for "not stacking referrals to a provider, which would have made the second appointment superfluous." Dkt. 158-1 at 45. The Court agrees.

Because no reasonable juror could find that Nurse Ellington was deliberately indifferent to Mr. Griffith's medical needs, Nurse Ellington is entitled to summary judgment as a matter of law.

### 2. Nurse Wigal

Mr. Griffith stated he sued Nurse Wigal because she delayed necessary treatment in late December 2017 to January 2018. He states that she processed an x-ray requisition three weeks late and failed to process the orthopedic referral from Dr. Bowen. Dkt. 145-14 at 64. It is undisputed that Nurse Wigal could not order specific testing or a referral for an outside provider consult, rather, she could only process the requests that were given to her. Mr. Griffith has not produced evidence that Nurse Wigal was aware that Dr. Bowen sought to order an x-ray on December 21, 2017. Rather, at his deposition Mr. Griffith testified that Nurse Wigal was not in the room during

26

his visit with Dr. Bowen. *Id.* at 63. Indeed, Mr. Griffith said he wrote to Nurse Wigal[22] and "made her aware of both [the x-ray and orthopedic consult] after waiting a couple weeks" and learned that a request was not in the computer, but that when Nurse Wigal responded to his request, she generated the x-ray requisition. *Id.* at 66. Based on this record, there is no evidence to support that Nurse Wigal intentionally stalled the referral process or ignored Mr. Griffith's need for an x-ray as directed by the provider, such that she was deliberately indifferent to his medical needs.

Mr. Griffith's argument that Nurse Wigal failed to process the orthopedic consult is also unavailing because Dr. Bowen's notes clearly indicate that such step was only "possible," and was not a "definitive" order. Though Mr. Griffith seeks to dispute the interpretation of "possible," the Court finds such argument is without merit—as the term explicitly implies there was a chance of such step, not a certainty that it would be needed or ordered. Mr. Griffith's conclusory assumption that Nurse Wigal should have clarified such direction with Dr. Bowen and did not do so, does not help his claim. Mr. Griffith was not present during any conversation that Nurse Wigal had with Dr. Bowen about the instructions in the medical chart and has provided no evidence that an orthopedic consult directive was given to Nurse Wigal to process.

No reasonable fact-finder could conclude that Nurse Wigal was deliberately indifferent to Mr. Griffith's medical condition. Accordingly, Nurse Wigal is entitled to summary judgment.

### 3. Nurse Kenekham

Mr. Griffith's argument that Nurse Kenehkahm was deliberately indifferent to his shoulder injury because she did not respond timely to his healthcare request in March 2018 and then refused

---

[22] When asked to the best of his knowledge when did Nurse Wigal become aware of Dr. Bowen's request, Mr. Griffith said it was a couple of weeks later, though he assumed Dr. Bowen forwarded the request, Mr. Griffith notified Nurse Wigal himself a couple of weeks later. Dkt. 145-14 at 66-67.

him a doctor visit is unpersuasive. While the healthcare request form indicates that Mr. Griffith dated it March 13 and that Nurse Kenekham responded the next month, the Court does not find that this delay resulted in further injury to Mr. Griffith. Mr. Griffith was scheduled to see a provider within four days of his submitted request—on March 17—but the appointment was rescheduled for April 16 because Mr. Griffith did not attend the previous appointment. Moreover, the medical records indicate that Mr. Griffith was seen by several providers prior to seeing Nurse Kenekham on April 17, had a normal x-ray that did not result in any actionable items, and had been prescribed Keppra for seizures and pain. Nurse Kenekham also instructed Mr. Griffith to apply heat and cool compresses and to submit an additional request if the pain continued.

Nurse Kenekham did not ignore Mr. Griffith's requests or symptoms, but rather, rendered treatment within the scope of her practice. Mr. Griffith's claims were limited to his allegations that Nurse Kenekam took excessive time to respond to him and refused him a referral to the doctor in March 2018, though the medical record evidences that she provided further medical care after this time period.

No reasonable fact-finder could conclude that Nurse Kenekham was deliberately indifferent to Mr. Griffith's medical condition. Accordingly, Nurse Kenekham is entitled to summary judgment.

### 4. Nurse Bergeson

The Court finds Mr. Griffith has not met his burden to show that Nurse Bergeson violated his Eighth Amendment rights. It is unclear from the evidence if Nurse Bergeson received or processed Mr. Griffith's healthcare request on May 1, 2018 requesting an MRI or to see a provider for his shoulder. However, even if Nurse Bergeson failed to completely respond to this healthcare

request, or if her response was that Mr. Griffith did not need to see a provider and there was no indication for an MRI, that response would have been reasonable and sufficient.

Nurse Bergeson undisputedly cannot order an MRI, nor does the medical record indicate that any provider had deemed one necessary at this time. Further, Mr. Griffith had been assessed on May 2, 2018 by two nurses for his annual well encounter, just one day after he put in this request form. And, Mr. Griffith was seen by a provider on May 15, 2018, for his migraines, in short order after he filed a healthcare request form about it on April 29, 2018. Nurse Bergeson noted on the request form that the date was May 6, 2018, which was after he had his well encounter and just prior to seeing Dr. Ippel a week later. Her response simply indicated that the topic of migraines had been addressed before, which is indicated from the medical record as an ongoing issue that Mr. Griffith experienced, for which he had received medication.

There is no indication that Nurse Bergeson ignored Mr. Griffith's medical needs or somehow circumvented him from seeing providers or from diagnostic testing. No reasonable fact-finder could conclude that Nurse Bergeson was deliberately indifferent to Mr. Griffith's medical condition. Accordingly, Nurse Bergeson is entitled to summary judgment.

### 5. HSA Scott

Mr. Griffith contends that HSA Scott did not assist him with obtaining a cuff-in-front pass to relieve his pain and that she declined to refer him to a doctor. It is undisputed that Ms. Scott's position is predominately administrative and that she typically does not respond to healthcare request forms, but did so in this case because they were sent to her by the medical staff. At the time Ms. Scott provided her responses to three different healthcare request forms, there had been no indication in the record that any provider had authorized a cuff-in-front exception for Mr. Griffith. It is undisputed that Ms. Scott did not have the authorization to order this exception.

Though Mr. Griffith argues that being cuffed behind his back was painful, and the record indicates that at times he refused treatment because he could not be cuffed in front, this is not evidence that Mr. Griffith met any criteria for this exception. To the extent that Mr. Griffith argues he had not sought a cuff-in-front pass prior to this interaction with Ms. Scott in August 2018 because it had not been an issue before he was placed in segregation, his argument does not persuade the Court that Ms. Scott did not respond appropriately. Further, Ms. Scott did not ignore or dismiss Mr. Griffith's request. Indeed, she instructed him that he would need to allow medical staff to assess him to determine his current range of motion because he had a history of refusing treatment and assessments, such as during his recent hunger strike.

To the extent Mr. Griffith argues that he raised his request for a cuff-in-front pass with providers later on, this does not establish a viable claim against Ms. Scott, as admittedly those requests would have been made after Ms. Scott responded to him in August 2018 and would only serve to show that he heeded her direction to seek a medical assessment to see if he met the criteria for a cuff-in-front pass.

Ms. Scott did not ignore Mr. Griffith's issues with being transported to physical therapy, instead, she instructed him to discuss this issue with custody staff. Ms. Scott's response and the record indicates that Mr. Griffith's missed physical therapy was rescheduled, regardless of whether he missed his appointments of his own volition or if the absence was not his fault. In the event that Mr. Griffith was seeking referral to a medical provider, and claims Ms. Scott did not assist him, her position was administrative and there was a process for Mr. Griffith to submit healthcare request forms to see medical staff. Mr. Griffith was regularly utilizing this process for multiple medical issues and received treatment from various providers within the timeframe of his claims.

No reasonable fact-finder could conclude that HSA Scott was deliberately indifferent to Mr. Griffith's medical condition. Accordingly, Ms. Scott is entitled to summary judgment.

### 6. Dr. Ippel

Mr. Griffith contends that Dr. Ippel refused to treat him and continued on an ineffective course of treatment that was not working in January 2018. But, Dr. Ippel was not Mr. Griffith's provider in January 2018. Dr. Ippel may have likely reviewed Mr. Griffith's x-ray results from that time, but if so, the results were normal and required no actionable items for follow-up. In February 2018, Dr. Ippel discontinued some of Mr. Griffith's medications because he was caught hoarding those medications. The Court finds such action appropriate because hoarding creates a dangerous risk of overdose. Mr. Griffith's medications were later reinstated, presumably once such hoarding behavior was either dispelled as inaccurate, no longer posed a risk, or it was imperative to put a patient back on medications.

Dr. Ippel did not have a provider visit with Mr. Griffith that year, until May 15, 2018. Mr. Griffith argues that he was told that only his migraines could be addressed at this appointment. But even if Dr. Ippel did not address Mr. Griffith's shoulder injury at that time, it does not establish deliberate indifference. Mr. Griffith still had a normal x-ray and was taking Keppra to address his pain. Dr. Ippel attested he did not have supervisory authority over other providers who were treating Mr. Griffith during this time, and that he believed the course of treatment to be reasonable and within the standard of care.

A doctor's treatment decisions are entitled to a great deal of deference. *See Petties*, 835 F.3d at 729; *Pyles*, 771 F.3d at 409. "The federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor

actually was exercising his professional judgment." *Pyles*, 771 F.3d at 409 (where prisoner wanted different treatment because his medications were not helping, his disagreement with the physician did not allow him to prevail on his Eighth Amendment claim where the physician's choice of treatment was not blatantly inappropriate).

Mr. Griffith has not made a showing that he needed an MRI, or any further diagnostic testing, or that the course of treatment was ineffective because any of the providers failed to eliminate his pain completely. Indeed, Mr. Griffith's condition is such that pain can occur, especially in the process of gaining strength and flexibility through the use of physical therapy, which both defendant physicians determined was a viable and best treatment option for Mr. Griffith's condition. The record further indicates at several points that Mr. Griffith was non-compliant with medication, physical therapy, or submitting to assessments by medical staff. Thus, his argument that the defendant doctors or other providers pursued an ineffective course of treatment lacks luster.

Mr. Griffith's claims against Dr. Ippel were limited to those that occurred in early 2018, but the Court especially notes that Dr. Ippel provided reasonable treatment during those times *and in further treatment* of Mr. Griffith's condition as he returned for his shoulder issue, inclusive of ordering subsequent x-rays to monitor any change in Mr. Griffith's prognosis and increasing his pain medication to help alleviate the symptoms he experienced. These efforts further evidence that Dr. Ippel did not ignore or disregard Mr. Griffith's ongoing medical needs.

No reasonable fact-finder could conclude that Dr. Ippel was deliberately indifferent to Mr. Griffith's medical condition. Accordingly, Dr. Ippel is entitled to summary judgment.

### 7. Dr Cabrera

The Court's analysis regarding Dr. Cabrera's treatment of Mr. Griffith in the summer of 2018 is much the same as for Dr. Ippel. Dr. Cabrera is entitled to exercise his medical judgment and did so upon his own medical encounter with Mr. Griffith and by review of the patient's history. When Dr. Cabrera began treating Mr. Griffith, he had been prescribed Mobic and increased doses of Keppra for pain. Dr. Cabrera ordered lab tests to monitor Mr. Griffith's Keppra levels with this increased dose to specifically see if anything should be changed in the course of his treatment at this point. When Dr. Cabrera noted that Dr. Ippel's x-rays appeared to not have been taken for Mr. Griffith's potential re-injury to his shoulders after a seizure, Dr. Cabrera entered the order so that this could be completed to specifically monitor Mr. Griffith for development of arthritis or any degenerative condition, presumably so Dr. Cabrera could change the course of treatment if needed. Dr. Cabrera also continued physical therapy, despite Mr. Griffith's sporadic participation in it.

The record indicates that Mr. Griffith's Keppra levels were so low, that it appeared as if he was not taking the medications as prescribed, and thus, it is reasonable for the Court conclude that no data could be acquired for Dr. Cabrera to have changed the course of treatment. Mr. Griffith has not shown that he tried previous courses of medical treatment or continued physical therapy with regularity or certainty to allow them to work to alleviate his symptoms—much less has he shown indication that different treatment from what he had already been provided was warranted or necessary.

Dr. Cabrera attested that the first line of treatment for Mr. Griffith's condition was rest, ice and heat to the area, and x-rays and the use of anti-inflammatories and physical therapy. This is the treatment protocol that was followed by Dr. Cabrera and Mr. Griffith's previous providers. And, it is telling to the Court that even after Mr. Griffith received MRIs he believed he needed, the independent orthopedic specialist and Mr. Griffith's current provider did not alter the course of

treatment. Rather, the conclusion of Dr. Misamore was that Mr. Griffith's subjective complaints did not match the objective findings in his examinations or diagnostic testing.

To the extent that Mr. Griffith argues that his physical therapist determined that he needed an MRI, a consult, or even surgery, this does not establish that the physicians were deliberately indifferent. Medical professionals may render different opinions, but the defendant doctors were entitled to deference in their decisions, "unless no minimally competent professional would have so responded under those circumstances" because "there is no single proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field." *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) (internal quotation marks and citations omitted). Mr. Griffith fails to establish that no minimally competent professional would have responded like Dr. Ippel or Dr. Cabrera. Rather, the facts indicate the opposite—especially by way of Mr. Griffith's medical evaluations by other doctors later on who did not change his course of treatment after further testing, and the standard protocol front-line treatment for shoulder injuries like Mr. Griffith had.

Further, the Court examines the totality of Mr. Griffith's medical care when evaluating whether the doctors, or any of the other defendants, were deliberately indifferent. *Wilson v. Adams*, 901 F.3d 816, 821 (7th Cir. 2018). Deliberate indifference "requires something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Donald v. Wexford Health Sources*, 982 F.3d 451, 458 (7th Cir. 2021) (internal quotations omitted). Neither Dr. Cabrera, nor any other defendant, ignored or disregarded Mr. Griffith's condition. Though Mr. Griffith may have disagreed with his treatment, this is not enough to establish deliberate indifference. "Disagreement between a prisoner and his doctor, or even between two medical professionals,

about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.* (internal citation omitted).

No reasonable fact-finder could conclude that Dr. Cabrera was deliberately indifferent to Mr. Griffith's medical condition. Accordingly, Dr. Cabrera is entitled to summary judgment.

### B. State-Law Claims

Invoking the Court's supplemental jurisdiction for state law claims, Mr. Griffith claims that the defendants' actions amounted to medical practice and negligence, and that the defendants subjected him to intentional infliction of emotional distress. These claims are rooted in Indiana law. Because they were joined with Mr. Griffith's Eighth Amendment deliberate indifference claims, the Court exercised supplemental jurisdiction over them pursuant to 28 U.S.C. § 1367. With all federal claims now dismissed in accordance with Part A above, the Court must determine whether it is appropriate to choose to continue to exercise supplemental jurisdiction over the state-law claims. For the reasons that follow, **the Court relinquishes supplemental jurisdiction** over all of Mr. Griffith's state law claims and **dismisses them without prejudice**.

The Court has discretion whether to exercise supplemental jurisdiction over a plaintiff's state-law claims. *Carlsbad Tech., Inc. v HIF Bio, Inc.*, 556 U.S. 635, 639 (2009); *see* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."). When deciding whether to exercise supplemental jurisdiction, "'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *City of Chi., v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

35

"While the court's decision is discretionary, when all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims." *Petropoulos v. City of Chi.*, 2021 WL 1103480, at *9 (7th Cir. Mar. 23, 2021) (cleaned up). The presumption may be rebutted (1) if dismissal of the state claim would create problems under the statute of limitations; (2) if the court has "devoted substantial resources to the dispute;" or (3) "if it is easy to resolve the state-law claims." *Id.* (internal citations omitted).

The Court finds no reason to deviate from the usual practice in this case. The statute of limitations will not have run on Mr. Griffith's state-law claims, as both federal and state law toll the relevant limitations period when claims are pending in a civil action (except in limited circumstances not present here). *See* 28 U.S.C. § 1367(d); Ind. Code § 34-11-8-1; *see also Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 266 (7th Cir. 1998). The Court has not expended significant resources on the pending state-law claims, and the Court does not expect that the parties' efforts with respect to those claims in discovery and briefing will go to waste. The evidence and legal research that would have been relevant in a federal case should be every bit as relevant in a state-court proceeding. Finally, as always, comity favors allowing state courts to decide issues of state law.

For these reasons, the Court exercises its discretion to **relinquish supplemental jurisdiction** over Mr. Griffith's state law medical malpractice, negligence, and intentional infliction of emotional distress claims.

### IV. Conclusion

Accordingly, the plaintiff's motion for summary judgment, dkt. [131] is **DENIED.** The defendants' cross motion for summary judgment, dkt. [143], is **GRANTED**.

36

Judgment consistent with this Order, the screening order (docket 7), the order reinstating certain defendants (docket 32), the Order granting the motion for summary judgment (docket 71), and the Order dismissing GEO Group, Inc. (docket 129), shall now issue.

The final pretrial conference and trial dates set in this action are hereby **VACATED**. All other pending motions are denied as **MOOT**.

**IT IS SO ORDERED.**

Date: 3/4/2022

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

JAMES GRIFFITH
117892
INDIANA STATE PRISON
INDIANA STATE PRISON
Inmate Mail/Parcels
One Park Row
MICHIGAN CITY, IN 46360

Douglass R. Bitner
KATZ  KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Adam Garth Forrest
BBFCS ATTORNEYS
aforrest@bbfcslaw.com

Adriana Katzen
BLEEKE DILLON CRANDALL ATTORNEYS
adriana@bleekedilloncrandall.com

Jarod M. Zimmerman
KATZ  KORIN CUNNINGHAM, P.C.
jzimmerman@kkclegal.com